## In re BALTIMORE & O. R. CO.
### Nos. 9294, A, B, C.

District Court, D. Maryland.
Oct. 9, 1939.

John J. Cornwell, R. Marsden Smith, and Daniel Willard, Jr., all of Baltimore, Md., Henry W. Anderson, of Richmond, Va., Leonard D. Adkins, of New York City, and George D. Gibson, of Richmond, Va., for petitioners.

Hovey C. Clark (of Larkin, Rathbone & Perry), Edward H. Stiefel (of Milbank, Tweed & Hope), John B. Marsh, E. S. Stewart, Leo Gottlieb, and Marshall K. Skadden, all of New York City, Alexander Armstrong, of Baltimore, Md. (of Armstrong, Machen & Allen) and Fred N. Oliver, all of New York City, and Cassius M. Clay, of Washington, D. C., for intervenors Banks and corporate trustees, assenters to plan.

Vincent A. O'Connor, of New York City, Henry Vogt and A. Walter Kraus, both of Baltimore, Md., Harold C. Ackert and John W. Giesecke, both of St. Louis, Mo., Cyrus B. Weller, of San Antonio, Tex., Meyer Abrams (of Shulman, Shulman & Abrams), of Chicago, Ill., Gersh I. Moss, of Baltimore, Md., Carl C. Sanders, of Beckley, W. Va., and Randolph Phillips and Edward A. Alexander, both of New York City, for intervenors objecting bond and note holders.

Before PARKER, Circuit Judge, and CHESNUT and DOBIE, District Judges.

CHESNUT, District Judge.

This is the first case under the recent Act of Congress (Chandler Act) approved July 28, 1939 which added a new chapter to the Bankruptcy Act, designated Chapter 15, entitled "Railroad Adjustments".[1] The petitioners are the Baltimore and Ohio Railroad Company, a Maryland corporation, and three of its subsidiaries. All four petitions were filed in this court on July 28, 1939, after the Act became effective. The purpose of all the petitions is to secure approval by the court of a general plan for the modification of existing provisions of outstanding securities of the respective railroad petitioners with respect to date of maturity or rate of interest, to be made legally effective and binding on those who have not voluntarily assented to the plan as well as on those holders of securities who have so assented.

The new chapter 15 of the Bankruptcy Act (§§ 700–755, 11 U.S.C.A. §§ 1200–1255) is in its general nature and purpose similar to section 77 of the same Act, 11 U.S.C.A. § 205, providing for the reorganization of railroads, but differs therefrom particularly in that it applies only to a railroad which has, prior to the filing of the court proceeding, secured voluntary assents to the plan by creditors holding more than two-thirds of the aggregate amount of claims affected by the plan, including at least a majority of the aggregate amount of claims of each affected class; and also has secured the prior approval of the plan by the Interstate Commerce Commission to the extent required by the Act. · The Act also provides for a three-judge court constituted in accordance with 28 U.S.C. § 380, 28 U.S.C.A. § 380. Section 725, 11 U.S.C.A. § 1225, prescribes that the approval of the plan by the court shall be conditioned on certain specific findings of fact which include the prior approval of the plan by three-fourths of the aggregate of all affected claims, including three-fifths of each class; and by the Interstate Commerce Commission; that the petitioner is within the classification of railroads to which the Act is made applicable and that the plan is not only in the public interest, and in the best interests of each of creditors and stockholders, but also is feasible and financially advisable, and "is fair and equitable as an adjustment affords due recognition to the rights of each class of creditors and stockholders and fair consideration to each class thereof adversely affected, and will conform to the law of the land regarding participation of the various classes of creditors and stockholders." Other provisions of the Act indicate quite clearly that its purpose is to provide relief for railroads which are only temporarily financially embarrassed and whose general earning capacity has not been so seriously impaired as to require the more drastic reorganization and modification of its debt structure provided for in section 77 of the Bankruptcy Act.[2]

---

[1] Public—No. 242—76th Congress—Ch. 393—1st Session; H.R. 5407, 11 U.S.C.A. §§ 1200–1255.

[2] The full text of section 725, and of section 710 therein referred to, is as follows:

"Sec. 725. If the special court shall find—

"(1) That, at the time of the filing of said petition as provided in article III hereof, the proposed plan of adjustment had been assented to by not less than

In addition to the specific findings of fact as conditions for the approval of the plan it is also required by section 725 that, if the plan is approved, the court shall file an opinion giving the reasons for its conclusions, and shall enter a decree which shall be binding upon the petitioner and upon all creditors and security holders of the petitioner, after which the petitioner shall have power and authority to put the

two-thirds of the aggregate amount of all claims of the petitioner affected by such plan, including at least a majority of the aggregate amount of claims of each such class;

"(2) That the plan of adjustment as submitted or as modified by the court has been accepted as submitted or, if modified, then as modified by or on behalf of creditors affected by such plan holding more than three-fourths of the aggregate amount of the claims affected by said plan, including at least three-fifths of the aggregate amount of the claims of each affected class;

"(3) That the plan meets the requirements of clause (c), and the petitioner meets the requirements of clauses (a) and (b) of subparagraph (2) of the first sentence of section 710, and that the plan is fair and equitable as an adjustment, affords due recognition to the rights of each class of creditors and stockholders and fair consideration to each class thereof adversely affected, and will conform to the law of the land regarding the participation of the various classes of creditors and stockholders: Provided, That in making the findings required by this clause (3), the court shall scrutinize the facts independently of the extent of acceptances of such plan, and of any lack of opposition thereto, and of the fact that the Commission, under section 20a of the Interstate Commerce Act, has authorized the issuance or modification of securities as proposed by such plan, and of the fact that the Commission has made such or similar findings;

"(4) That all corporate action required to authorize the issuance or modification of securities pursuant to such plan shall have been duly taken;

"(5) That the petitioner has not, in connection with said plan or the effectuation thereof, done any act or failed to perform any duty which act or failure would be a bar to the discharge of a bankrupt, and that the plan and the acceptance thereof are in good faith and have not been made or procured by any means, promises, or acts forbidden by this Act; and

"(6) That, after hearings for the purpose, all amounts or considerations, directly or indirectly paid or to be paid by or for the petitioner for expenses, fees, reimbursement or compensation of any character whatsoever incurred in connection with the proceeding and plan, or preliminary thereto or in aid thereof, together with all the facts and circumstances relating to the incurring thereof, have been fully disclosed to the Court so far as such amounts or considerations can be ascertained at the time of such hearings, that all such amounts or considerations are fair and reasonable, and to the extent that any such amounts or considerations are not then ascertainable, the same are to be so disclosed to the Court when ascertained, and are to be subject to approval by the special court as fair and reasonable, and except with such approval no amounts or considerations covered by this clause (6) shall be paid.

"Said court shall file an opinion setting forth its conclusions and the reasons therefor and shall enter a decree approving and confirming such plan and the adjustment provided thereby, which decree shall be binding upon the petitioner and upon all creditors and security holders of the petitioner; and thereafter the petitioner shall have full power and authority to and shall put into effect and carry out the plan and the orders of the special court relative thereto and issue the securities provided by the plan without further reference to or authority from the Commission or any other authority, State or Federal, except where required by any law relating to the Reconstruction Finance Corporation, and the rights of all creditors and security holders with respect to claims and securities affected by the plan shall be those provided by the plan as so approved and confirmed: Provided, however, That the title of any owner, whether as trustee or otherwise, to rolling-stock equipment leased or conditionally sold to the petitioner, and any right of such owner to take possession of such property in compliance with the provisions of any such lease or conditional sale contract, shall not be affected by the provisions of this chapter.

"No plan shall be approved under this chapter unless the special court finds that with respect to the continuation of, or any change in, the voting rights in the petitioner, control of the petitioner, and the identity of, and the power and manner of selection of the persons who are to be directors, officers, or voting trustees, if any, upon the consummation of the plan and their respective succes-

plan into effect and issue new securities provided for without further reference to or authority from the. Commission, or any other authority, State or Federal, except where required by the law relating to the Reconstruction Finance Corporation. As the nature of the case requires the decree herein to be unusually elaborate and detailed, including specific findings of fact, this opinion will be limited to a statement of the court's conclusions and the reasons therefor.

sors, the plan makes full disclosure, is adequate, equitable, in the best interests of creditors and stockholders of each class, and consistent with public policy." 11 U.S.C.A. § 1225.

"Sec. 710. Any railroad corporation not in equity receivership or in process of reorganization under section 77 of the Bankruptcy Act at the time of filing its petition hereunder, and which has not been in equity receivership or in process of reorganization under said section 77 within ten years prior to the filing of such petition, which shall have—

"(1) Prepared a plan of adjustment and secured assurances satisfactory to the Commission of the acceptance of such plan from creditors holding at least 25 per centum of the aggregate amount of all claims affected by said plan of adjustment (including all such affected claims against said corporation, its parents and subsidiaries), and

"(2) Thereafter obtained an order of the Commission, (but not of a division thereof), under section 20a of the Interstate Commerce Act authorizing the issuance or modification of securities as proposed by such plan of adjustment (other than securities held by, or to be issued to Reconstruction Finance Corporation), such order of the Commission to include also specific findings:

"(a) That such corporation is not in need of financial reorganization of the character provided for under section 77 of this Act;

"(b) That such corporation's inability to meet its debts matured or about to mature is reasonably expected to be temporary only; and

"(c) That such plan of adjustment, after due consideration of the probable prospective earnings of the property in the light of its earnings experience and of such changes as may reasonably be expected,—

"(i) is in the public interest and in the best interests of each class of creditors and stockholders;

"(ii) is feasible, financially advisable, and not likely to be followed by the insolvency of said corporation, or by need of financial reorganization or adjustment;

"(iii) does not provide for fixed charges (of whatsoever nature including fixed charges on debt, amortization of discount on debt, and rent for leased roads) in an amount in excess of what will be adequately covered by the probable earnings available for the payment thereof;

"(iv) leaves adequate means for such future financing as may be requisite;

"(v) is consistent with adequate maintenance of the property; and

"(vi) is consistent with the proper performance by such railroad corporation of service to the public as a common carrier, will not impair its ability to perform such service:

"Provided, That in making the foregoing specific findings the Commission shall scrutinize the facts independently of the extent of acceptances of such plan and of any lack of opposition thereto: Provided further, That an order of the Commission (or of a division thereof) under section 20a of the Interstate Commerce Act, made prior to April 1, 1939, authorizing the issuance or modification of securities as proposed by a plan of adjustment (other than securities held by, or to be issued to, Reconstruction Finance Corporation), shall be effective for the purpose of this subparagraph (2) of the first sentence of section 710, notwithstanding failure to include therein the foregoing specific findings, if such order did include the specific findings that such proposed issuance or modification of securities is compatible with the public interest, is consistent with the proper performance by the railroad corporation of service to the public as a common carrier, and will not impair its ability to perform such service, and

"(3) Secured assents to such plan of adjustment by creditors holding more than two-thirds of the aggregate amount of the claims affected by said plan, which two-thirds shall include at least a majority of the aggregate amount of the claims of each affected class, may file in the United States district court in whose territorial jurisdiction such railroad corporation has had its principal executive or principal operating office during the preceding six months or a greater period thereof, its petition averring that it is unable to meet its debts, matured or about to mature, and desires to carry out the plan of adjustment.

"A copy of the order obtained from the Commission, as above provided, shall be filed with the petition and made a part thereof." 11 U.S.C.A. § 1210.

Upon the filing of the petition in the District Court for Maryland the District Judge at once convened the court of three judges consisting of the Senior Circuit Judge of the Circuit, and two District Judges, and notified counsel for the petitioners that a preliminary hearing would be held in open court on July 31, 1939. As a result of the hearing then held, and in accordance with the procedure outlined in the Act, orders were then entered approving the petitions as filed, temporarily enjoining creditors affected by the plan from instituting or prosecuting adversary proceedings, and fixing a date for hearing on the merits for September 18, 1939, and requiring notice thereof to be given both by publication and direct mailing to all persons in interest whose addresses were known. A number of creditors sought intervention by petition which has been allowed in all cases. In accordance with, and after proof of the giving of notice as required, a hearing was held in open court on September 18, 19 and 20, 1939, at which time elaborate evidence was submitted on behalf of the petitioners, and all parties in interest whether represented by attorney or appearing in person and desiring to be heard on the plan, were so heard.

The Baltimore and Ohio Railroad Company is one of the oldest railroads in the United States, its charter having been granted by the State of Maryland in 1827.[3] It now furnishes railroad service to many of the large cities in the central eastern territory, including New York, Philadelphia, Wilmington, Baltimore, Washington, Pittsburgh, Cincinnati, Cleveland, Toledo, Buffalo, Rochester, Indianapolis, Louisville, St. Louis and Chicago. For transportation of heavy freight its lines are immediately accessible to the vast bituminous coal tonnage of West Virginia, Maryland and Pennsylvania, and also for the receipt of shipments of steel in the territory producing approximately 80% of the production thereof in this country. Including its subsidiaries it operates approximately 6400 miles of railroad. Its financial structure, as a natural result of more than one hundred years of development, is now highly complex. Including certain underlying bonds it has outstanding twenty-six separate issues of securities aggregating in principal amount as of August 15, 1938, $638,353,928. The funded debt of its several subsidiaries (not assumed by the Baltimore and Ohio, but interest thereon provided for in operating agreements) is $46,472,150, making a total of funded debt of $684,826,078. It also has outstanding common stock to the par value of $256,295,348, and preferred stock in the amount of $58,863,137, with capital stock of subsidiaries outstanding in the amount of $167,050, or a total capitalization roundly of one billion dollars. The consolidated general balance sheet as of July 31, 1939 shows corporate surplus, in addition to outstanding stocks, in the amount of $49,229,363.56; and the testimony in this case is to the effect that the fair value of the property is greatly in excess of the total outstanding obligations, although the recent current revenue and cash position is not sufficient to meet all presently maturing obligations of principal and interest. In point of gross earnings the Baltimore and Ohio is fifth among the railroads of the country, and third in the East.

*The necessity for the plan.* During the past thirty-seven years and until 1938 the Baltimore and Ohio was able to and did meet currently all interest and other obligations when due. Owing to the changed economic conditions, commonly referred to as the depression, with varying severity in recent years, the railroad industry has suffered in common with others. The evidence shows that the earning capacity of the Baltimore and Ohio Railroad is greatly in excess of its recent gross revenues. In 1926 its gross earnings were $277,033,370; but for 1937 were only $169,436,436; and for 1938 about $135,000,000. In the intervening years railway operating expenses had proportionately greatly increased by reason of higher taxes and wages so that net railway operating income, which for 1926 was $53,422,758, declined in 1937 to $24,908,625. In 1938 the aggregate fixed charges on the funded debt of the Company and its subsidiaries, were $31,421,742 a year. From 1924 to 1930 inclusive, the net income available for fixed charges averaged $54,891,668 a year, or $23,469,926 more than such charges; but during the next seven year period, from 1931 to 1937 inclusive, the combined earnings averaged only $31,839,943 per annum or $842,000 less than required after charging roundly $6,500,000 per year for depreciation.

---

[3] Acts of Maryland of 1826, Ch. 123.

In 1937 the Company failed to earn fixed charges after depreciation by $720,695; and, owing to the severe business recession which developed in the latter part of that year and continued into 1938, it became apparent before the middle of the latter year that net earnings for 1938 would be insufficient to pay fixed charges in the amount of approximately $13,000,000 and that, to avoid receivership or reorganization the Company would have to have temporary relief from some of its fixed charges. Several factors combined to create this acute financial embarrassment. The business recession had greatly reduced gross earnings. The apparent up-turn of business in the early part of 1937 had induced the Company to inaugurate a somewhat ambitious maintenance program and to contract for additional equipment at a total cost of over $10,000,000; the discontinuance on December 31, 1936 of the emergency freight rate increase had reduced earnings for 1937 by about $7,000,000, although this was substantially off-set by increased rates allowed effective through a part of 1938; in 1937 a wage increase of about 7.34% became effective which increased operating expenses based on 1937 pay rolls, by about $6,000,000; taxes were increasing and the cost of materials and supplies remained high; and in 1939 to 1942 inclusive, the Company faced maturities of principal of security issues approximating $185,000,000. For the first six months of 1938, the revenue declined $26,399,528, or 30% as compared with 1937, and the Company failed by $11,741,308 to earn its fixed charges for that period. There was some improvement in the latter half of the year, but for the whole year the Company failed by $13,124,530 to earn its fixed charges. Even so, the Company would probably have been able to weather the temporary storm had it not been that since 1931 it had been required to meet maturities of its funded debt aggregating $172,585,700; most of which had occurred at times when the securities markets were so depressed that refunding by ordinary means was impossible; in consequence of which the Company had been forced to borrow large amounts from the Reconstruction Finance Corporation, and to pledge practically all of its available treasury securities.

In these circumstances the management conceived the idea that it would be in the best interests of the Railroad and its security holders to devise a plan for temporary relief of such a nature that it could reasonably expect to obtain the voluntary assent thereto of a very large proportion of its security holders. To formulate such a satisfactory plan the financial officers of the Company early in 1938 conferred with a number of institutional holders of large amounts of its securities and with many individual holders. They manifested a spirit of ready cooperation, and, as a result of numerous protracted conferences, the present plan of debt adjustment was agreed upon and submitted to the holders of all securities proposed to be affected by the plan as of August 15, 1938. The evidence shows that the plan as finally prepared was influenced very largely by the advice and suggestions of these security holders. Having obtained approval by the holders of more than 25% of the amount of affected securities, the plan was submitted to the Interstate Commerce Commission and after public hearings was approved by the Commission on November 1, 1938. Thereafter the Company, having obtained voluntary assents to the plan by approximately 73% in amount of affected security holders, declared the plan operative, to the extent that assents theretofore given could not be withdrawn, and thereafter and until the filing of this proceeding, after the passage of the Chandler Act, the Company voluntarily paid to its affected security holders only the amount of interest provided for in accordance with the plan. The Company continued to obtain voluntary assents to the plan, and at the time of filing the petitions in this case it had obtained such assents from the holders of more than 87% in the aggregate of the affected securities, including more than 60% of each class affected by the plan.[4]

---

[4] These percentages are calculated on the total amount of the respectively affected issues outstanding in the hands of the public, not including treasury bonds of certain of the issues affected *pledged* as collateral security for other issues. The assents to the plan by holders of particular affected securities are, impliedly at least, assents to the modification of the terms of other affected securities pledged as collateral for those directly held. But apart from this the evidence shows that the Reconstruction Finance Corporation, as the holder of $64,388,750 of Refunding Bonds pledged as collateral for notes of the Baltimore and Ohio held by the R. F. C. expressly has assented to the plan not only with respect to the notes held by them in the amount of $72,771,578.44 but "also in

Only about 1% in amount of security holders affected by the plan have definitely dissented therefrom. Of the remainder, who have not expressly assented to the plan, many have not been heard from at all. It is said that approximately $17,000,000 of the affected securities are held in Europe.

*The nature and provisions of the plan.* A copy of the plan was filed with the petition as Schedule B. It is a printed document of 13 pages to which are annexed detailed schedules of the several security issues of the Railroad Company and its subsidiaries, income and profit and loss accounts for the years 1924 to 1937 (and eight months of 1938) both inclusive, and forms of certificates of deposit for assenting security holders. The plan is set out in detail in the report of the Interstate Commerce Commission, a copy of which is filed with the petition as Schedule C. It will be sufficient here to outline the main features of the plan without meticulous detail as to all its subordinate provisions.

The chief purpose of the plan is (1) to effect an extension of the maturities of certain issues aggregating approximately $185,000,000 falling due in the next four years, 1939-1942 inclusive, without reduction of the principal amount thereof; and (2) to reduce (during the period of eight years) the fixed interest charges on certain other issues to a minimum sum below which it is reasonably anticipated the net income available for interest payments will not fall; and (with two exceptions hereinafter mentioned) with provision for the payment of additional interest up to the amount originally contracted for cumulatively if and when earned in subsequent years, and in any event as an absolute obligation upon the maturity of the principal of the respective issues (including any acceleration of maturity), if not sooner paid from available net income. In effect, therefore, the securities affected by the plan, to the extent of the reduced interest rate thereon, are made cumulative income bonds for the eight year period only, with provision for the payment of full original interest if earned, and deficiencies therein to be cumulative. The interest rate so temporarily reduced is properly called "contingent" interest. To the extent not earned and paid during the eight year period it is to be paid when and as earned in subsequent years; and, after the eight years the full original interest rate is restored and is to be absolutely payable at the stated times as originally provided.

Section 4 of the plan contains detailed provisions for the determination and application of net income available for payment of contingent interest. One of such provisions is that net income otherwise applicable to contingent interest may, in the discretion of the board of directors of the company, be applied to the creation of a capital fund for "additions and betterments" to an amount not exceeding 2½% of the total railway operating revenues of the Company for the calendar year; and that for the calendar year 1939 only an additional sum up to $10,000,000 may, in the discretion of the management, be applied to increase the Company's working capital; the reason for this latter provision being to partially restore the depletion of working capital caused by the payment therefrom of interest to the amount of about $11,000,000 not earned during 1938. The remaining available net income for any calendar year is to be applied pro rata to the payment of the contingent interest created by the plan and not previously paid on certain designated *secured* issues; and still remaining available net income thereafter is to be applied pro rata to the unpaid and accumulated contingent interest on other specified *unsecured* issues; after which 75% of any remaining available net income for the calendar year shall be paid into the sinking fund provided for in Section VI of the plan; with the final provision that still remaining available net income for the year, if any, may be applied to any corporate purpose of the Company. It will be noted that the effect of these several pro-

---

respect of all securities affected by said plan which are held by this corporation as collateral for said notes of the Railroad Company." Including these pledged bonds the percentage of assents to the aggregate of affected securities is 81.40% and the percentage of assents to the particular issue is 75.70% (and more than 60% of each of the other affected issues), thus gratifying the requirements of the Act whether the percentages are calculated on the aggregate of bonds directly held by the public only or the aggregate is based on an inclusion with them of the pledged bonds. See Exhibits Nos. 212 and 214.

visions is that no dividend can be paid on the stocks of the Company while any accrued contingent interest remains unpaid, and even if all contingent interest has been earned and paid up to a particular date, 75% of the remaining net income otherwise applicable to general corporate purposes including dividends, must be paid into the sinking fund for five years and thereafter 50% must be paid into the sinking fund, which is to be set aside out of the income for every calendar year, until all obligations for contingent interest shall have been paid and $100,000,000 aggregate principal amount of obligations shall have been retired by the operation of the fund.

The security issues of the Baltimore and Ohio Railroad Company and its subsidiaries affected by the plan, by the extension of maturity of principal, or reduction of fixed interest charges for the eight-year period, are listed in Schedule D filed with the petition, and the proposed modifications thereof are to be found in section III of the plan and also in Schedule I annexed thereto. The following schedule lists the affected issues and shows the principal modifications thereof proposed.

### Claims Affected by the Plan

| Class | Description | Amount outstanding in hands of public |
|---|---|---|
| 1. | The Baltimore and Ohio Railroad Company, Pittsburgh, Lake Erie and West Virginia 4% Bonds, due November 1, 1941. The principal will be extended at the same rate of interest for 10 years; interest to continue as a fixed charge | $ 43,182,000.00 |
| 2. | The Baltimore and Ohio Railroad Company, Five Year 4½% Secured Notes, due August 1, 1939. The principal will be extended for 5 years with interest reduced from 4½% to 4%, to continue as a fixed charge | 50,000,000.00 |
| 3. | The Baltimore and Ohio Railroad Company Notes to Reconstruction Finance Corporation. Will be extended from various present maturities to mature 5 years after the effectuation of the plan with interest at 4% to continue as a fixed charge | 72,771,578.44 |
| 4. | The Baltimore and Ohio Railroad Company, First Mortgage 5% Bonds, due July 1, 1948. 5% interest reduced to 4%, 1% made contingent and cumulative | 75,000,000.00 |
| 5. | The Baltimore and Ohio Railroad Company, Southwestern Division 5% Bonds, due July 1, 1950. 5% interest rate reduced to 3½% fixed interest and 1½% contingent interest cum. | 45,000,000.00 |

### Claims Affected by the Plan

| Class | Description | Amount outstanding in hands of public |
|---|---|---|
| 6. | The Baltimore and Ohio Railroad Company, Refunding and General Mortgage Bonds. 5% and 6% interest respectively on different series reduced to 1% and 1-1/5% respectively which will remain a fixed charge and remainder of original rate to be contingent and cumulative | 158,120,750.00 |
| 7. | The Baltimore and Ohio Railroad Company, Thirty-Year Convertible 4½% Bonds, due February 1, 1960. Interest at same rate to be made contingent and cumulative | 63,031,000.00 |
| 8. | Buffalo, Rochester and Pittsburgh Railway Company Consolidated Mortgage 4½% Bonds, due May 1, 1957. Two-thirds of present interest rate to remain a fixed charge and remainder made contingent and cumulative | 29,114,000.00 |
| 9. | Lincoln Park and Charlotte Railroad Company First Mortgage 5% Bonds, due January 1, 1939. Principal will be extended for 10 years at same interest rate and interest to remain a fixed charge | 350,000.00 |
| 10. | Buffalo and Susquehanna Railroad Company First Mortgage 4% Bonds, due December 30, 1963. Sinking Fund for this issue to be modified by waiving interest on bonds held in the sinking fund for 8 years | 2,566,300.00 |
| 11. | Cincinnati, Indianapolis & Western Railroad Company, First Mortgage 5% Bonds, due November 1, 1965. Three-fifths of the present interest rate to remain a fixed charge and remainder made contingent and cumulative | 3,675,000.00 |
| | Aggregate | $542,810,628.44 |

Note: The General and Refunding Mortgage Bonds outstanding in the hands of the public consists of four series, as follows:

| | | |
|---|---|---|
| Series A, 5% due December 1, 1995 | $ 60,000,000.00 |
| Series C, 6% due December 1, 1995 | 35,000,000.00 |
| Series D, 5% due March 1, 2000 | 30,000,000.00 |
| Series F, 5% due March 1, 1996 | 33,120,750.00 |
| | $158,120,750.00 |

It will be noted that the principal amount of affected securities aggregates $542,810,628.44 as compared with the total aggregate principal of all securities in the amount of $684,826,078. The changes made in the several issues are not uniform, but vary with the legal status and earning position of the respective issues. A distinction is made in the treatment of (1)

secured and unsecured interest; and (2) as to secured interest, between senior and junior liens. In general, issues secured by a first lien on the property and the revenues therefrom, deemed adequate to pay all interest thereon, are not affected by the plan at all; and these include so-called underlying bonds assumed by the Baltimore and Ohio Railroad Company, which are listed in schedule I annexed to the plan. The result of the modifications made is to reduce presently *fixed* interest in the amount of $11,376,435 to *contingent* interest payable only when earned or upon maturity of principal; of which amount $7,115,040 is secured contingent interest, and $4,261,395 is unsecured. It is believed that with this deduction from fixed interest the Company will be relieved from financial embarrassment so far as the future can be foreseen. The fixed interest charge after the deduction will be $19,644,-679 (as of 1938) which ought to be well within the net income within the reasonably foreseen future, in view of the past history as to net earnings applicable to fixed interest, which for the fourteen-year period from 1924 to 1937, averaged $43,365,305, and for the seven-year period of economic depression, 1931 to 1937 inclusive, averaged $31,838,943. With respect to the net earnings for 1938, the most disastrous year that the Company had experienced for nearly forty years, the conditions prevailing were quite abnormal, but nevertheless the net earnings applicable to fixed interest were more than $18,-000,000. The present estimate is that the net earnings for 1939 will be about $25,-000,000.

■ *Conclusions as to the plan in general.* Before discussing the several objections which have been made to particular features of the plan, we will state our conclusions with regard to the plan in general with respect to whether it is fair, equitable, feasible and in the public interest. In our opinion it is. The present conditions must be viewed realistically in the light of actualities. The Railroad and its security holders are faced with conditions and not theories. And in judging the nature and characteristics of the plan it is necessary to visualize the alternative which must be faced if the plan is not approved. When the Company declared the plan operative (although still not legally effective) and thereafter made default in its interest payments falling due, except to the extent provided for in the plan (in order to treat all security holders alike and to avoid any preferential payments) a very few security holders whose coupons were not paid in full brought suit and obtained judgments against the Company, which have been satisfied in the comparatively trifling amount of a few hundred dollars in order to avoid the embarrassment of execution on the judgments. At least one suit has also been brought for the appointment of a receiver. It is obvious that the only alternative to this plan or possibly some other of the same general nature, is equity receivership or drastic reorganization under section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205. The Company has no source of revenue to meet its obligations except its net income from railway operations. These at this time are materially insufficient to meet present fixed interest charges. Either receivership or reorganization is highly undesirable if it can be avoided. The immediate effect would very probably be suspension of all interest payments; and it is unfortunately the experience that railway receivership or reorganization is often protracted for many years. Experience also teaches us that it is very expensive and often ineffective as compared with the more free management of a solvent going railroad. In addition, as the matter was well put by an experienced witness in this case, there is often apparently inevitable and subconscious if not intentional, letting down of efficiency in economical management where there is absence of the pressure of the necessity to meet currently maturing obligations. The courts are sometimes a necessary sanctuary for the temporary relief of financially embarrassed railroad and other corporations for the purpose of conservation of values for property owners and continued operation of public utilities in the interest of the public. But it is generally recognized that the necessary limitations on the ability of judicial supervision make it less effective than independent management.

Therefore, from the standpoint of security holders, it seems entirely obvious that a voluntary plan which assures payment of all available earned net income on account of fixed charges should be preferable to receivership or reorganization with probable temporary and possibly protracted suspension of all interest payments. And it is equally clear that such a voluntary plan is in the public interest in that it insures continuation of public service by one of the principal railroads of the country with-

out embarrassment from pressing creditors. The railroads of this country are still a vital necessity in facilitating interstate commerce and any plan which materially aids them in performing this service must be in the public interest. Nor should it be overlooked that a receivership of the Baltimore and Ohio Railroad Company would likely have a very undesirable sympathetic effect on the credit of railroads of the country generally, in view of the present financial and economic problems affecting many of them. The Interstate Commerce Commission in its report and order dated November 1, 1938, has specifically determined after consideration of this plan that it is "compatible with the public interests" and consistent with the proper performance by the petitioners of public service as common carriers, will not impair their ability to perform that service and is reasonably necessary and appropriate for those purposes. We are charged by the Chandler Act to reach our conclusion as to the nature of the plan independently of the prior action of the Commission; and so considered, we have no hesitation in finding that the plan is distinctly in the public interest.

We also conclude without difficulty that the plan is feasible in that, from the supporting testimony submitted, it seems reasonably clear, within the limitations of human foresight, that it can be successfully carried through, and is not likely to be followed by the insolvency of the corporation or by the need of further financial reorganization or adjustment. The testimony shows very convincingly that the plan has reduced fixed interest to an amount well within the earning capacity of the Railroad to produce net income available therefor, and that the fixed charges as so reduced will in all probability not exceed the probable earnings available for the payment thereof, after adequate maintenance of the property. The financial history of the Railroad for the last thirty-seven years shows that it has always met its obligations during that period, and the embarrassing conditions prevailing in 1938 were abnormal and not likely to again occur with such severity. As has been pointed out the maximum fixed interest for the next eight years is not much more than the net income for 1938. Furthermore there has already been a very decided pick-up in the net earnings for 1939, and in fact during the three months of June, July and August, the Railroad actually earned all interest then accruing under the plan both fixed and contingent (without deductions for capital fund and working capital provided for in the plan), and it seems probable that that earning rate, in view of recently changed conditions, will continue throughout this year although the net result for the whole year will, of course, not be so favorable in view of the smaller earnings of prior months. It is also to be noted that since the plan was promulgated, the market value of the securities affected by the plan has increased from the low of 1938 to the high of August 1939 in the aggregate amount of $77,215,420, an increase of 78.71%; and has increased as of September 15, 1939 in the total amount of $102,946,835, a percentage of 104.94. Probably changes in economic conditions as well as the prospect of the plan have influenced this result.[5]

*General and particular objections to the plan.* The Chandler Act requires as a condition to the approval of the plan that it shall be found "in the best interests of each class of creditors and stockholders", § 710, 11 U.S.C.A. § 1210, as well as in the public interest, and "that the plan is fair and equitable as an adjustment, affords due recognition to the rights of each class of creditors and stockholders and fair consideration to each class thereof adversely affected, and will conform to the law of the land regarding the participation of the various classes of creditors and stockholders". § 725, 11 U.S.C.A. § 1225. Of course it does not follow that because the plan in its general aspects is desirable, each and all of its provisions is fair and equitable with respect to each of the several classes of creditors and stockholders: The Interstate Commerce Commission did not specifically pass on this latter phase of the plan. It said: "To make the arrangement effective, however, substantially all security owners affected by it must consent. We are not asked to approve the plan as such. Our authorization will place applicants in position to seek the approval of their securityholders. The alternative is clearly reorganization under the bankruptcy statute. In such a proceeding, securityholders undoubtedly would be called on for much greater immediate sacrifices than this plan contemplates. Approval of the applications by us will make the option available to the parties interested."

---

[5] See Exhibit No. 233.

■ It is, therefore, necessary to consider the provisions of the plan as they relate to the several classes of creditors. The Chandler Act does not require the express affirmative assent to the plan by the stockholders; but it is too clear for argument or discussion that the plan is in the best interests of both the preferred and common stockholders of the corporation. None of them has objected in this proceeding to the plan. But this is not necessarily so with respect to the several classes of creditors as they are not uniformly treated in the plan. The number of individual and corporate holders of securities affected by the plan is 76,128, of whom 72.77% have assented thereto as of September 15, 1939. The principal par value of securities held by assenting holders is $476,489,928, which is 87.79% of all the affected securities.[6] Only about 1% in amount of securities held have expressly dissented; and only a very small fraction of 1% have intervened in these proceedings and voiced opposition to the plan in person or by attorney. The number of those actively here objecting in person or by attorney or by letter, to the confirmation of the plan as a whole, or suggesting material modifications thereof, are only about 20, the amount of their aggregate holdings being about $250,000. In the analogous proceeding affecting private corporations under section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207 (now chapter 10 as amended by the Chandler Bankruptcy Amendment Act of 1938, 11 U.S.C.A. § 501 et seq.), the courts have often given weight to the fact that the plan of reorganization has been approved by a very large percentage of all affected creditors and stockholders; but in the Act now under consideration the court is charged in this respect to "scrutinize the facts independently of the extent of acceptances of such plan, and of any lack of opposition thereto, and of the fact that the Commission, under section 20a of the Interstate Commerce Act, has authorized the issuance or modification of securities as proposed by such plan, and of the fact that the Commission has made such or similar findings." § 725, 11 U.S.C.A. § 1225. In reaching the conclusions herein expressed we have observed this requirement of the Act.

■ Before discussing the objections to the particular provisions of the plan, with respect to its somewhat diverse effect on different classes of creditors, we will consider the more general objections to the plan as a whole. First, there is an objection presented in writing by three or four creditors, although not orally argued, that the Act is unconstitutional. We find no legal merit in this contention in view of the recent decision of the Supreme Court in the case of Continental Illinois Nat. Bank & Trust Co. v. Chicago, Rock Island & Pacific R. Co., 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110, upholding the validity of section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205; and the numerous cases affirming the constitutionality of section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207 (now ch. 10 of the amended act, 11 U.S.C.A. § 501 et seq.) involving the financial reorganization of private corporations. Kuehner v. Irving Trust Co., 299 U.S. 445, 57 S.Ct. 298, 81 L.Ed. 340; Campbell v. Alleghany Corp., 4 Cir., 75 F.2d 947, certiorari denied, 296 U.S. 581, 56 S.Ct. 92, 80 L.Ed. 411; see, also, the case of Wright v. Vinton Branch of Mountain Trust Bank of Roanoke, 300 U.S. 440, 57 S.Ct. 556, 81 L.Ed. 736, 112 A.L.R. 1455, upholding the somewhat kindred statute known as the second Frazier-Lemke Act 11 U.S.C.A. § 203(s) as therein construed by the court. The point now particularly urged is, that the power of Congress over bankruptcy legislation is limited by the constitutional provision that the laws passed must be "uniform * * throughout the United States". Constitution, Art. I. § 8, clause 4, U.S.C.A. It is urged in this case that the law in effect is not uniform in that its availability is so restricted that it was necessarily limited to a few railroads which at the time were in a particular position or occupied a specific status; and that the preferential treatment thus accorded to them constituted particular and not uniform legislation on bankruptcy. The Act is, however, in general terms and applicable to all railroads conforming to the prescribed conditions of the statute, and applies uniformly in that respect throughout the United States. As the power of Congress in this respect was plenary subject only to the due process clause, the Act is not made invalid by its limited scope, nor because there may be at the present time only a few railroads conforming to the classification made by the Act. It is also argued that the Act violates the due process clause

---

[6] See Exhibit No. 212.

in that it is in substance retroactive because made applicable to a limited class of railroads having an acquired and particular status prior to the passage of the Act. It is also said that the Act is invalid because it delegates to the courts (in *combination* with the Interstate Commerce Commission) the power to regulate interstate commerce by special and preferential financial treatment of a few interstate railroad carriers. We find no legal merit in these several contentions.

 It is contended by counsel for some non-assenting creditors that the petitioners' case does not comply with the Chandler Act in two respects; (1) that it has not been shown that the Railroad Company is unable to meet its debts as they mature and (2) that it has not obtained 60% of assents from one separate class of creditors, to wit, the non-assenting security holders. Both propositions are based on an untenable construction of the provision of the plan under which the Company declared it "operative" on January 18, 1939, after obtaining assents of more than 73% of affected creditors. The contention is that thereby the non-assenting creditors became and constituted a new and separate class, and the plan must therefore fail because the Company has not obtained the assents 'of 60% of this class. And it is contended that because the assenting creditors became bound by the plan the Company is not obligated to them except in accordance with the plan, and **is** financially able to meet the claims of the non-assenting creditors. Even if the latter contention were sound, and we think it is not, it overlooks the testimony that the Company by reason of the payment of $11,000,000 of unearned fixed interest, has been required to defer the payment of several million dollars of vouchers for supplies.[7] Furthermore the contention is based on a misinterpretation of ss. 8 and 9 of the plan. These sections provide that "The Company may declare the Plan operative whenever, in the judgment of the Board of Directors of the Company, the holders of sufficient amount of the obligations affected by the Plan *(whether or not sufficient to carry out the Plan as provided in the third paragraph of Article IX hereof)* shall have become subject to the Plan

to make it advisable so to do. * * * A declaration that the Plan is operative will not change the rights of security holders, whether or not they shall have assented to the Plan, except by terminating the right of withdrawal provided by the last paragraph of Article VIII hereof. * * * No securities of any class deposited under the Plan will be stamped or exchanged for new securities issuable under the Plan unless and until holders of at least 90% of the securities of each issue of the Company affected by the Plan outstanding in the hands of the public shall have accepted or become bound by the Plan. If the Board of Directors of the Company shall so determine, the Plan may be carried out through proceedings under section 77 of the Bankruptcy Act or other law at the time in force, or through such other legal proceedings as the Board of Directors may deem appropriate to effectuate the Plan as to non-assenting minorities. The assents to be executed by security holders will provide that they will be effective as assents to the Plan in any such legal proceeding as fully as if executed after the institution of such proceedings, subject, however, to withdrawal rights, as provided herein or by law, in the event of any modification of the plan." (Italics supplied). These provisions clearly make a distinction between circumstances under which the plan could be declared "operative", and when it becomes legally "effective" and thereby binding on the assentors. It is also clear that the plan contemplated that it might be made legally effective on non-assenting creditors only through legal proceedings; and it is to be noted, the Company did not succeed in obtaining assents from 90% of the securities of each issue prior to the institution of this proceeding.

 It is argued that after the Company declared the plan operative there was no provision in the plan as to how or when assentors to the plan could withdraw therefrom; unless the Company definitely abandoned the plan; and therefore the assentors were bound even if the Company was not. But this is immaterial because there was necessarily an implication that the Company must act within a reasonable time and it is apparent that it did so act

---

[7] The Railroad's general balance sheet of July 31, 1939 shows current assets in the amount of $23,558,247.71 (including cash in the amount of $7,975,147.08) with current liabilities in the amount of $36,724,250.17, including "audited accounts and wages payable" in the amount of $11,703,696.15.

by initiating this proceeding. The contention is also obviously untenable because it would preclude all possibility of the confirmation of any plan under the Act if there was a single dissenting creditor holding a single $1,000 bond. It is also manifestly contrary to the plain language and clear intention of the Act which was to bind non-assenting creditors on the conditions specified. The kindred Acts of Congress relating to reorganizations of private corporations and railroads have a like main objective. The main purpose of the Chandler Act is to accord equal treatment to all security holders where the plan has been approved by a requisite percentage of all and of each class, and the plan otherwise conforms to the requirements of the Act.

 There is a similar but somewhat different contention by counsel for a few of the non-assenting holders of the Refunding and General Bonds, based on the provision in the mortgage securing that issue, which provided that the Company would not extend or assent to the extension of the time for payment of coupons, and that if any coupons should be extended they should not be entitled to the benefit of the security of the mortgage except after prior payment in full of the principal and interest on the other bonds. It is argued that the effect of the plan was to extend the time of payment of coupons on bonds held by assenting holders of this issue, and thus to create non-assenting creditors a distinct and preferred class, of which 60% have not assented to the plan. It is also said that even if this preferred class was not created when the plan was declared operative by the Company, nevertheless it must be considered to have been created when the Company in fact put the plan into practical operation during 1938 by paying only the fixed interest stipulated in the plan and making default as to the contingent interest.[8] This argument seems highly technical

rather than substantial in relation to the large and important case here presented. But in addition we consider the contention unsound. The covenant in the mortgage referred to is a customary and conventional one in mortgage deeds of trust. It obviously looks to a situation where there is a liquidation and distribution among security holders in the event of a foreclosure of the mortgage; and we think it can have no proper application in this proceeding, the very object of which is to prevent mortgage foreclosure and liquidation. It may also be said that the Company doubtless exceeded its authority under the plan in making default in the payment of the full coupon interest rate before the plan had become legally effective, and that this failure was without legal excuse, although the default was obviously not in bad faith with respect to the non-acquiescing creditors because the Company had the highly practical reason that it was without available funds to make the payment, and as to the assenting creditors, the Company was clearly acting in good faith in the intention to temporarily treat all alike pending the prospective legal proceeding to accomplish that purpose.

 Again it is argued that the court should withhold approval of the plan by reason of alleged unfair activities of the Company in securing assents to the plan. In this connection it is said that in many cases the corporate trustees of the affected issues were unduly influenced in favoring assents by bondholders by reason of the fact that the trustees were made depositories for the bonds and compensated for their services in that capacity. But the evidence shows that there was no improper activity in this respect, because the respective corporations were acting in entirely different capacities, and their compensation for the largely clerical services as depository cannot be said to have improperly influenced their activities as trustee in the matter of obtaining assents, with

[8] In support of this contention counsel cite In re Nine North Church St., 2 Cir., 82 F.2d 186. But that case involved a very different situation. The non-assenting creditors there classified (as well as the assenting creditors) were not creditors of the debtor corporation but of a prior corporation which had transferred its equity to the debtor. The whole debt had been guaranteed to the creditors of the prior corporation by a surety company which, prior to the organization of the debtor, had secured assents to the voluntary reduction of interest rate from some creditors but not from others. In reorganization proceedings affecting the debtor transferee corporation the trial court had enjoined suits by non-assenting creditors against the guarantor. The substantial point in the case was the holding on appeal that under the circumstances the issuance of the injunction was erroneous.

respect to which they had no power or duties as trustee under the trust indenture.

■ It is also urged that the plan as a whole is unfair because its financial effect on the individual holders of small amounts of bonds is naturally much more severe than on institutional holdings such as life insurance companies and savings banks, whose holdings are much greater in amount, and the reduction of the interest on which entails less personal hardship; and it is suggested that without the assent of these large holders probably the requisite percentages of assents could not have been obtained. Undoubtedly these personal considerations do in fact exist and are inherent in this particular situation as in many other similar financial and economic problems, although there is no specific testimony in this case on which to base the argument. If individual hardship does result in particular cases it is a regrettable but unavoidable incident of an existing economic condition in which the court, under the authority and command of Congress carries out a plan for the greatest good of the greatest number, and in so doing it is axiomatic that the courts must deal judicially with all alike on even terms and without respect to particular personalities; or, in other words, must deal with creditors according to their respective classes irrespective of individuals composing the classes.

■ We come now to a consideration of the treatment accorded by the plan to the several classes of creditors. We have concluded that the plan is fair and equitable in this respect, and that the distinctions made in the treatment of the several classes are equitable and justified by the testimony in the case which, without contradiction, other than by argumentative inference, fully supports the different provisions for the several classes. As previously indicated the general classification with respect to interest adjustment is based on the legal status and earning position of the respective issues. Thus underlying bond issues assumed by the Railroad Company and secured by underlying mortgages are not affected by the plan because the earnings of the Railroad properly applicable thereto are amply sufficient to pay the interest charges. Again, of the issues affected by the plan, the amount of fixed interest reduction has been determined principally by consideration as to whether the issues are secured by mortgage (or

collateral), and the further consideration as to whether the security constitutes a first or junior lien. Thus in accordance with the plan the contingent interest to the extent earned is to be preferentially paid first to secured issues and secondly to unsecured issues. In the case of the Baltimore and Ohio Railroad First Mortgage 5% Bonds, 1% of the interest is not secured by any lien, and is therefore placed in the secondary position with respect to the application of contingent interest earned from time to time. And likewise in case of the Baltimore and Ohio Southwestern Division Bonds, 1½% of the interest rate is not secured by any lien and is similarly treated.

In view of the positive and uncontradicted testimony supporting the diverse treatment of the several issues, we conclude that the modifications made in the issues respectively are fair and equitable *inter sese,* and we will not prolong the discussion by considering the details with respect to each issue except to the extent that particular objection has been urged and argued. In this connection it is to be noted that no objection has been made with respect to the treatment accorded the securities of any of the three operating subsidiaries of the Baltimore and Ohio Railroad, with respect either to extension of maturity date or rate of interest thereon.

■ The Refunding and General Mortgage Bonds, some of which bear an interest rate of 5% and others 6%, constitute the largest of the affected issues (about $158,-000,000) outstanding in the hands of the public, and the interest reduction thereon under the plan is more severe than in the case of other secured issues, the 5% bonds being reduced to fixed interest of 1% with 4% contingent, and the 6% bonds proportionately reduced. The legal status of this mortgage is that it is a first lien on 418 miles of railroad, a second lien on 3900 miles, and a third lien on 714 miles. It is also partially further secured by the deposit of railroad treasury collateral which, it is estimated under the plan, will yield income approximately sufficient to pay the amount of fixed interest as so reduced. And the contingent interest, if earned, is to be paid pro rata with other secured contingent interest out of available net income if earned, in preference to contingent interest on unsecured issues. It might be thought that some additional

fixed interest should be allocated to this issue by reason of its being secured by a first lien on 418 miles of road, but the uncontradicted evidence is that the 418 miles does not constitute a part of the main railroad lines but consists of small branch lines and extensions, of light traffic density without estimated net earnings therefrom under present conditions. Under the plan the holders of these bonds are given a conversion privilege into common stock of the Railroad at $100 per share. At the present this is a consideration of no moment in view of the small market price of a share of the stock, but in the past the stock has had a market value of at least $120 per share and it is, of course, possible that in the long run this conversion privilege may become of some value. In view of the testimony we have concluded that the treatment of this issue is fair and equitable in relation to the plan as a whole.

The most pressed objection as to inequitable treatment of a particular issue relates to Baltimore and Ohio Five-Year 4½% Secured Notes due August 1, 1939, oi which $50,000,000 are outstanding, and which the plan provides shall be extended for a period of five years bearing interest at the rate of 4% per annum as a fixed charge, thus reducing the interest rate from 4½% to 4%, without making the reduced ½% contingent. Similar treatment has been accorded the secured notes held by the Reconstruction Finance Corporation with respect to extension of maturity and reduction of interest rate from 5% to 4%. As the Reconstruction Finance Corporation has assented to the plan it is sufficient to discuss the objections urged on behalf of a few holders of the 4½% Five-Year Notes. These holders do not object to the extension of the maturity of the notes for five years but do object to the reduction of the interest rate. It is to be noted that the holders of 90.01% of these notes have assented to the plan. Testimony also shows that the market price of these notes has advanced from a low of 30 in March 1938, before the promulgation of the plan, to a present bid price of 54¼. While this market advance may well have been influenced in part at least by conditions unrelated to the plan, it seems quite obvious from the high percentage of assents and market advance that the plan itself has not been generally regarded as unfair to this issue, but rather the contrary. Apart from this it ·is our independent judgment after a full consideration of the testimony, that the treatment accorded this issue is fair and equitable in relation to the plan as a whole. In the first place it is to be observed that we are dealing here with an issue the principal of which has matured, and therefore somewhat different considerations apply than in the case of future maturities. The question really is what is a fair rate of interest to be paid on a short five-year secured note issue, and we have no doubt that under existing economic conditions 4% is a fair rate. The short five-year maturity which will occur within the eight-year period of the plan affecting other securities, seems to insure the principal payment in full at maturity of this issue if the Railroad Company remains solvent, which the plan itself tends to assure. Again, there are considerations arising from the nature and value of the collateral security for this issue which justify the reduced rate. While heretofore the yield from this collateral has been sufficient to pay the 4½% rate and may possibly continue to do so, the evidence shows that this depends very largely on the uncertain future rate of dividends on stock of the Reading Railroad which in turn by the evidence may be unfavorably affected by the financial conditions of the Central Railroad of New Jersey. It is at least uncertain whether the collateral securing this note issue will continue to yield more than 4% on the $50,000,000 issue, but nevertheless the plan makes the 4% rate a fixed interest charge irrespective of the yield from the collateral, which now has a market value of about $35,000,000 only, which is much less than the par value of the issue of $50,000,000. If the notes were not renewed and the collateral sold there would be a 30% principal loss; but by renewal for five years with 4% fixed interest (as a part of approximately only $20,000,000 fixed interest) the position of this note issue seems to be definitely benefited.[9]

---

[9] With respect to this security issue a question has been raised whether the 4% rate will obligatorily continue after the five-year maturity provided for · in the plan in the event of default in payment at maturity. And with respect to the similarly situated .R. F. C. Notes it is said there is no agreement for the inter- ·est rate on them to be so continued aft- ·er maturity as extended by the plan. It

*Dividends.* Objection is made to the particular provisions of the plan under which there is a possibility of paying some dividend on the common stock during the eight-year period. It is provided in section 4 of the plan that no dividend on the stock of any class shall be paid unless all contingent interest for prior calendar years shall have been paid or deposited in trust and provision made for payment of such interest for the current calendar year. And the provisions for the sinking fund effectually limit even the possibility of payment of any dividend to 25% of the excess earned income for any year for a period of five years and 50% thereof for the remainder of the eight-year period. Nevertheless it is pointed out that there is a possibility that within the eight-year period, in the event the Company experiences a highly successful year with large net earnings, there might be some free money for general corporate purposes which could legally be applied in the discretion of the board of directors to the payment of some dividend on the stock. It is urged that in fairness to the bond and note holders, no dividend at all should be paid at any time during the eight-year period no matter how large the net earnings, but all excess earnings should be carried to a reserve for the payment therefrom if necessary of unearned contingent interest accumulating at any time thereafter during the eight-year period. This objection has some merit, but after consideration we do not think it has sufficient weight in all the circumstances to justify withholding approval of the plan on that account, or to require a modification of the plan in that respect. The bare possibility of any dividend payment on the stock during the next eight-year period seems quite remote; and if the net earnings in now unanticipated sufficiently large amount to make the payment of some dividend justifiable should result, it seems quite probable that the market value of the securities would be so enhanced that they could be sold by a dissatisfied holder without loss. In addition to this consideration the provision which requires the payment of all accumulated contingent interest before payment of any dividend seems adequate protection for the creditors.

*Deductions from net earnings for capital fund and working capital.* There is also some complaint about the provision giving discretion to the board of directors to set aside out of net earnings, before payment of contingent interest, an amount not exceeding 2½% of operating revenue for any calendar year as a capital fund for "additions and betterments". We are satisfied, however, from the testimony that the provision is wise and really in the interest of the security holders in the long run. The money so set aside and used goes into the property and adds to the security for the bondholders. It is also a very necessary fund for the efficient and successful operation of the Railroad as a going concern. In railway cost accounting there is a necessary and valid distinction between charges for maintenance proper and those made for real additions and betterments. The former is properly chargeable directly to earnings, and the latter to capital. In the operation of a successful large railroad system extending through many States there arise many occasions where capital expenditures are quite necessary for improvements and betterments, such as the construction of sidings, facilitating shipments directly from factories, and for improvement of crossings, for more and improved equipment and possibly heavier rail to the extent that constitutes a betterment as distinct from ordinary maintenance. Many such expenditures are required from time to time by local laws with which it is imperative the railroad must comply. They are clearly in the public interest and often inure directly to the benefit of creditors in increased earnings. The testimony shows that the particular provision was regarded as highly important in the judgment of experienced holders of securities of the Company in large amount and was strongly urged upon the Company in conferences preliminary to the final draft of the plan.

There is also some criticism of the plan's provision for the deduction from net earnings otherwise applicable to contingent interest, of a sum not exceeding $10,000,000 in the discretion of the board of directors of the Company, but for the year 1939 only, to restore working capital which had been necessarily reduced by the pay-

---

is not necessary to pass on this point at this time because it will more properly arise on consideration as to approval of the legal instrument proposed to modify the issue; and counsel can then be heard on that point if desired.

ment in 1938 of about $11,000,000 for interest which had not been earned. This provision has no continuing effect after the year 1939, and seems to be a reasonable provision in the interests of the security holders themselves to improve the working capital of the Company which is necessary to it as a going concern. It is now estimated that the net earnings for 1939 will be $25,581,000 which, after deducting $19,145,000 to pay fixed interest under the plan for that year, will leave about $6,436,000 to apply at the 2½% rate to capital fund for additions and betterments ($3,796,000) with $2,640,000 only to be added to working capital in the discretion of the Company. But in addition the Company's cash position will be bettered by net depreciation allowance on equipment less payment therefrom of maturing equipment trusts, in the amount of about $2,600,000; so that for 1939 the Company ought to have roundly $9,000,000 to be applied in the discretion of the board of directors to additions and betterments and working capital which, in the view of the management, should put the Company in a fairly good cash position.

█ *Other objections.* As bearing particularly on the feasibility of the plan, a security holder, who is a railroad economist, urges upon us that the plan is defective in that it does not make provision for payment or refunding of the principal maturities which will occur under the plan in five years; that is, the $50,000,000 secured note issue and the Reconstruction Finance Corporation notes of $72,771,578.44. It is pointed out that these maturities must be met either from accumulated net earnings or by refunding; and that there is no reasonable prospect that the net earnings will be sufficient for that purpose, and it is said that it is very doubtful if there can be a successful refunding. It is suggested that the prospects for the latter would be increased if the $50,000 note issue were to be made convertible into the collateral securities therefor at a conversion price reasonably attainable and attractive to the noteholders. In this same connection attention is called to the requirement of the Chandler Act that, in approving the plan, the court must find that it "is * * * not likely to be followed by the insolvency of said corporation, or by need of financial reorganization or adjustment." § 710, 11 U.S.C.A. § 1210. We have carefully considered these objections to the plan.

We realize that it does not now seem very probable that the five-year maturities can be met from excess earnings but, in view of the testimony submitted, we do not think it can be said there is no reasonable prospect of a successful refunding. It is suggested that the testimony comes from interested witnesses who are unduly optimistic but it is uncontradicted and we do not feel at liberty to disregard it and ourselves speculate as to the future. In any event, as pointed out by the Interstate Commerce Commission, the inevitable alternative is reorganization under the Bankruptcy Act which, as has been pointed out, is highly undesirable in the interests of all classes of security holders. It is suggested that the plan might be modified, but modification in this respect would require re-submission to securityholders at very great additional expense and with uncertainty as to result. The suggested modification does not seem to us sufficiently definite and practicable to justify this expense and possible jeopardy of the plan.

█ It is also urged that the plan is unduly favorable to the stockholders and therefore inequitable as to creditors because the stockholders are not now required to make any sacrifice or reduction of their interests; and that in effect the plan allows stockholders for eight years the benefit of a "gamble" at the creditors' risk. It is suggested that the plan should be modified in that respect and at least some stock interest now given to creditors in consideration for the reduction in their fixed interest rate. If the plan had made such provision, we are not prepared to say that it would have been inequitable as to the stockholders but on the other hand we do not consider the failure of the plan to so provide makes it inequitable for the creditors under all the circumstances. It is not required that the court find the plan an ideal one in every respect.

█ There are still further objections to particular subordinate provisions of the plan which have been noted in certain petitions for intervention or even more informally, although some of them have not been orally argued. Thus objection is made to the last paragraph of section 4 of the plan, providing for determination of net income, which, in the event of unification of the Company's property with another corporation having outstanding bonds on which interest payments are in whole or in part contingent on earnings, allows (with the con-

sent of the majority of the holders of the bonds of the petitioners on which interest is contingent by virtue of the plan) the earnings from such other property to be excluded in whole or in part in determining available net income, with provision for determination of available net income without the maintenance of separate accounts. But this provision is in essence only a convenient method of bookkeeping. Further objection is made to the 5th paragraph of section 4 of the plan on the ground that the power of the board of directors in determining "available net income" to deduct deficits of a prior year before paying contingent obligations should be made mandatory rather than discretionary, and that the word "may" should be changed to "must" in that paragraph. Again it is said that there should be provision for a sinking fund to secure payment of contingent interest at least two years in the future. And there are still other objections to particular subordinate provisions of the plan which, with those just mentioned, we have considered, but which we do not find of sufficient importance to warrant modification of the plan or to need further discussion.

▇▇▇ There is among the informal protests of some individual bondholders, in small amount, the general objection that the plan is unfair in that it imposes all the reduction of interest on junior securities without imposing any deduction on the senior securities including the underlying bond issues. In addition to what has already been said on this subject, it is sufficient to point out the Act requires in section 725 "that the plan shall afford due recognition to the rights of each class of creditors and stockholders and fair consideration to each class thereof adversely affected, *and will conform to the law of the land regarding the participation of the various creditors and stockholders.*" It is said by counsel for the petitioners that this last phrase which has been italicized was intentionally included in order to assure treatment of classes of creditors in the order of the seniority of their liens and thus conform to the legal requirements as outlined in the case of Northern Pacific Railway Co. v. Boyd, 1913, 228 U.S. 482, 33 S.

Ct. 554, 57 L.Ed. 931. Apart from that specific case it is, of course, generally recognized that equity follows the law in the matter of preference between senior and junior liens. In this sense it would generally be inequitable to fail to recognize the preferential position of a senior lien in comparison with a junior lien. It is, therefore, no objection to the plan that underlying bonds and senior issues are preferred in treatment to junior liens and unsecured issues, especially as there is no absolute reduction of interest on any of the affected issues, (with the exception of the five-year $4\frac{1}{2}\%$ issue and the Reconstruction Finance Corporation loans which have been above mentioned), but only a postponement of the interest thereon made contingent until actually earned, or until maturity of the principal of the issues if the contingent interest is not sooner paid.[10]

▇▇▇ It is called to our attention by one or two bondholders that the plan does not make express provision as to the continued management of the Company, and it is suggested this may constitute a defect in the plan in view of the last paragraph of section 725 of the Chandler Act, 11 U.S.C. A. § 1225, which provides that no plan shall be approved unless the Court finds "that with respect to the continuation of, or any change in, the voting rights in the petitioner, control of the petitioner, and the identity of, and the power and manner of selection of the persons who are to be directors, officers, or voting trustees, if any, upon the consummation of the plan and their respective successors, the plan makes full disclosure, is adequate, equitable, in the best interests of creditors and stockholders of each class, and consistent with public policy."

Counsel for the Company has called attention to the legislative history of the Act from which it appears that this particular provision was inserted as a very late amendment in view of an existing situation affecting another railroad, and having no intended particular reference to the Baltimore and Ohio plan, which had been published a year earlier. While the language in the amendment is not literally applicable to the particular situation it may fairly be said that the probable intention was to re-

---

[10] See, also, In re 620 Church St. Bldg. Corp., 299 U.S. 24, 57 S.Ct. 88, 81 L. Ed. 16; Kansas City Terminal Ry. Co. v. Central Union Trust Co., 271 U.S. 445, 46 S.Ct. 549, 70 L.Ed. 1028; In re Philadelphia & Reading Coal & Iron Co., 3 Cir., 105 F.2d 357; Compare (under section 77B) Downtown Inv. Ass'n v. Boston Metropolitan Bldgs., 1 Cir., 81 F.2d. 314, 323.

quire a full statement as to future management *if* a change was to be made, so that creditors would have full notice thereof by the plan. In the instant case it is clearly inferable at least from the plan that no change was intended with respect to future management, and therefore it did not occur to the drafters of the plan to expressly mention it. It is not suggested that the failure to expressly and affirmatively state that no change was intended was deceptive or in bad faith; nor does it appear that any creditor has been in fact in any way misled or prejudiced by the alleged omission. The matter is indeed more formal than substantial, because no testimony has been submitted in criticism of the integrity and competency of the present management of the Baltimore and Ohio Railroad, and very little adverse comment informally from the bondholders. The recent economic situation with which the management of the railroad has been confronted was obviously a matter over which they had no control and their present inability to successfully meet their current maturing obligations is accidental and fortuitous rather than due to the lack of foresight. Their financial problem is due primarily to the large amount of maturities of principal occurring in a period when it has been impossible to refund or refinance maturing issues under ordinary financial conditions.

▪ Counsel for the petitioners are very explicit in their view that there is no real omission or defect in the plan with regard to full disclosure as to continued management, and at the bar of the court have expressly stated that the fair and only reasonable construction of the plan as a whole means that no change in management was contemplated or intended, although they frankly say that if the plan were being re-written in view of the subsequent amendment an express statement on the point would have been included. They suggest, however, that there may be included in the decree affirming the plan an explicit statement that the plan is to be so construed. In the circumstances we conclude that this will be sufficient without a formal modification of the plan; and we are further of the opinion that even if the clarification in the decree could properly be regarded as a modification of the plan there would be no necessity to re-submit it either to the Interstate Commerce Commission or to the creditors in view of the provisions of section 721 of the Chandler Act, 11 U.S.C.A.

§ 1221, which provide for modification of the plan by the court without requiring re-submission of it to the Commission unless the modification substantially alters the basis for the specific findings included in the order made by the Commission; and without re-submission to the creditors unless the modification substantially or adversely affects the interests of any class or classes of creditors. In our opinion neither of these conditions exists here.

▪ We add a word with respect to the amount of expenses incurred and to be incurred by the Company in furtherance of the plan which, by the Chandler Act, section 725(6), 11 U.S.C.A. § 1225(6), we are required to find fair and reasonable as a condition to the approval of the plan. These expenses, and the nature of and necessity therefor, have been fully disclosed in the evidence and on consideration we approve them. The total amount so far incurred (about $600,000) seems indeed large in the aggregate, but the expenses are itemized in detail and cover a large number of separate and necessary services including the postage of hundreds of thousands of pieces of mail, stationery and printing, advertising, telephone and telegraph, fees of depositories, legal expenses, traveling expenses and compensation of agents in the solicitation of assents to the plan. It is pointed out that the amount while unavoidably large is only about one-quarter of one per cent. of the principal amount ($185,000,000) of the securities extended as to maturity, as compared with the usual cost of refunding maturing obligations which varies under present conditions from $1\frac{1}{2}\%$ to $2\frac{1}{2}\%$ of principal.

In short summary, we find and conclude from consideration of the plan and the testimony in support thereof that it is fair and equitable and indeed highly desirable and advantageous for all the creditors as well as in the public interest; and that it is feasible in that it has a reasonable prospect of being successfully carried out so that in the long run the creditors will have the best chance to ultimately avoid substantial loss on their investments, and the Railroad will be enabled to continue its service to the public as an interstate common carrier.

At the conclusion of the hearing counsel submitted for our consideration a printed tentative draft of requested decree, and copies thereof were furnished to counsel for objecting creditors. This is an elaborate paper of 52 printed pages which re-

630

cites in considerable detail the prior procedure in the case, makes jurisdictional findings, recites the classification of claims and acceptances, makes specific findings as required by the Chandler Act, confirms the plan; and in Article VII, entitled "effectuation" (of the plan) provides for approval of the numerous supplemental indentures and endorsements on or written modifications of the legal instruments securing or relating to the issues affected by the plan, to effectuate the changes therein made by the plan. Copies of these legal papers were filed as exhibits at the hearing and are now among the papers in the case in the custody of the clerk of the court. We will by separate order in the case shortly to be filed fix a further date for hearing and acting upon any objections to the proposed decree or any amendments thereof later submitted, and also for considering and acting upon any proposed modification of any of the supplemental legal instruments heretofore filed, or as hereafter amended, to effectuate the plan; and will direct that notice of such hearing be given to all parties to the case or their counsel of record, and also by publication.

