### In re BALTIMORE & O. R. CO.
### No. 9294.

District Court, D. Maryland.
Aug. 3, 1940.

Appeal Dismissed Nov. 12, 1940.

See 115 F.2d 455.

Harold C. Ackert and John W. Giesecke, both of St. Louis, Mo., Meyer Abrams (of Shulman, Shulman & Abrams), of Chicago, Ill., and Gersh I. Moss, of Baltimore, Md., for intervenors.

Marshall K. Skadden, of New York City, Arthur W. Machen, of Baltimore, Md., and Leo Gottlieb, of New York City, for Bank of Manhattan.

John J. Cornwell, Gen. Counsel, of Baltimore, Md., .Henry W. Anderson (of Hunton, Williams, Anderson, Gay & Moore) of Richmond, Va., Carl A. deGersdorff and Leonard D. Adkins (both of Cravath, deGersdorff, Swaine & Wood), both of New York City, and George D. Gibson (of Hunton, Williams, Anderson, Gay & Moore), of Richmond, Va., for petitioner Baltimore & Ohio R. Co.

Before PARKER and DOBIE, Circuit Judges, and CHESNUT, District Judge.

CHESNUT, District Judge.

This case is a proceeding before a statutory three-judge court under Chapter 15 (Railroad Adjustments) of the recently amended bankruptcy act (11 U.S.C.A. §§ 1200–1255). On July 28, 1939 the Baltimore and Ohio Railroad Company and three of its subsidiaries filed petitions in this court for adjustment of their securities in accordance with a certain Plan; and after the procedure provided for in the statute, including an extended hearing of testimony and arguments of counsel, we confirmed the Plan by decree entered November 8, 1939. 29 F.Supp. 608. Thereafter the Supreme Court denied certiorari on January 29, 1940 (309 U.S. 654, 60 S.Ct. 470, 84 L.Ed. 1003), and on March 25, 1940 denied a re-hearing of the application for certiorari. (309 U.S. 697, 60 S.Ct. 709, 84 L.Ed. 1036).

The decree authorized and directed the Railroads as soon as practicable to execute supplemental indentures or modifying agreements respecting the classes of securities affected by the adjustment; to notify the security holders to present their securities for modification in accordance with the Plan; and, in accordance with section 1246 of Chapter 15, the decree further directed the Railroad Companies to submit to the court such reports of the action taken by them in the execution of the Plan as might be necessary to a final disposition of the cause. In accordance therewith the Railroad Companies severally on May 25, 1940 filed their reports in this court stating in detail that the supplemental indentures and modifying agreements had been executed and delivered for record; that the holders of the securities had been notified to present their notes or bonds for modification; that the very great majority of each class of the affected securities had been so modified (more than 90% of all but one); and as so modified authorized to be listed on the New York Stock Exchange; and the B and O had made or tendered to the holders of all securities affected by the Plan the interest payable in accordance therewith.

The aggregate amount of fixed interest payable by the Railroad on all its securities was approximately $31,000,000 a year. The effect of the confirmed Plan of adjustment reduced *fixed* interest to about $20,-000,000, and provided that the payment of the balance of the whole interest, about $11,000,000, should be *contingent* upon net earnings available therefor; and to the extent earned, in accordance with the provisions of the Plan, the contingent interest should be payable first to deficits on certain secured issues affected by the Plan, and thereafter to unsecured issues so affected, the amount of the *secured contingent* interest being about $7,000,000, and *unsecured* about $4,000,000. Under the Plan, before determination of net earnings available for contingent interest, it was provided that the B and O might deduct from available net income 2½% of gross operating railway revenues to be applied to a capital fund for additions and betterments, and for the year 1939 only, an additional sum up to $10,000,000 to increase the Company's working capital, which had been depleted by payment of unearned interest in 1938. The reports further showed that the available net earnings of the B and O for the year 1939, otherwise applicable to contingent interest, was $9,858,448.05, and that the board of directors had applied $2,000,000 thereof to the capital fund for additions and betterments, and the remaining $7,-858,448.05 to increase working capital; and that accordingly there was no remaining available net income for the year 1939 applicable to the payment of contingent interest. Subsequent testimony in this case at the recent hearing submitted by Mr. George M. Shriver, senior vice president of the B and O, was to the effect that the present indications for the year 1940 are that the available net income applicable to fixed and contingent in-

terest would exceed $31,000,000; although of course, in accordance with the Plan, the amount of contingent interest earned will be payable first to the secured contingent interest in priority to the unsecured, both being cumulative.

Upon the petition of the Railroads the court ordered that notice be given by mail to all parties in the case and by publication to all in interest, that a hearing would be held on July 16, 1940 to consider and act on the reports so filed for the consideration and approval of all expenses paid or incurred by the B and O in connection with the Plan and the execution thereof, and to consider other matters relating to the final disposition of the cause (subject, however, to the retention of jurisdiction in the district court to the extent necessary to protect and enforce the rights of the parties under the Plan and the orders of court thereon). Section 1246.

One class of securities affected by the Plan was the B and O $50,000,000 Five-Year 4½% Secured Notes due August 1, 1939. The Plan provided that the maturity of these notes should be extended for five years with interest reduced from 4½% to 4%, and to continue as a *fixed* interest charge. This issue is secured by collateral of $38,000,000 B and O Refunding and General Mortgage 6% Bonds and by large amounts of preferred and common stocks of the Reading (Railroad) Company owned by the B and O and deposited as collateral security with the Manhattan Company, as successor trustee under the collateral deed of trust, all of the securities being registered in its name as trustee. Under the terms of the deed of trust the dividends on this Reading stock are receivable by the trustee which is under the duty to pay them over to the B and O until there is some default under the deed of trust, except in a certain contingency hereinafter particularly discussed.

On September 18, 1939 the Manhattan Company, Trustee of this B and O note issue, was, on its petition, permitted to intervene and become a party to this case. Like petitions for intervention on behalf of trustees for other security issues were also granted. On May 29, 1940 the Manhattan Company, Trustee, filed its petition in this case asking for instructions as to whether dividends on Reading stocks in the amount of $1,412,000, which it had received as Trustee on and after August 1, 1939, should now be paid by it to the

B and O in view of a question which had arisen with respect to the contingency above referred to. On this petition the court passed its Order No. 19 directing the B and O to give notice of the hearing on said petition by mail to each known holder of the five-year $50,000,000 notes at their respective addresses, and by publication of notice, that a hearing would also be given on said petition on July 16, 1940.

In accordance with such notices, shown to have been given, a hearing on all these matters was held on July 16 and 17, 1940, the court now consisting of two circuit judges (Judge Dobie having been duly appointed Circuit Judge for the Fourth Circuit since the last hearing) and a district judge. The B and O submitted further evidence of what had been done by it pursuant to the decree in execution of the Plan; and also submitted in itemized detail a statement of all expenditures made or incurred by it in connection therewith. With respect to the execution of the Plan in accordance with the decree, no objection was raised by any one as to the manner or legal sufficiency of what had been done by the B and O; and no further discussion thereof is necessary.

With respect to the expenditures of the B and O, the requirement of section 1225 (6) of the Act is that all such expenditures, with the facts and circumstances relating to the incurring thereof, must be disclosed to the court, and are to be subject to the approval of the court as fair and reasonable, and no other amounts than those so approved shall be paid by the petitioner. A finding to this effect by the court is made a condition precedent to the confirmation of the Plan. At the former hearing in September last the B and O submitted a full statement as to the expenses then so far incurred and, so far as ascertainable, those likely to be subsequently incurred in the execution of the Plan. We than gave consideration to and approved the expenditures which had been incurred at that time in the amount of about $600,000. See 29 F.Supp. 629. Since then substantial further expenditures in executing the Plan have been paid or incurred. They are itemized in various exhibits filed in the case and the whole are summarized on Exhibit No. 406. The aggregate of all expenditures made or incurred from the inception of the Plan to its final execution is $1,489,431.35. This includes the expenditures heretofore made and approved in the amount of more than

$600,000. We have given careful consideration to the aggregate amount of this expenditure and of the several items thereof, the circumstances as to the incurring of which have been very fully explained by testimony at the several hearings in the case. We reach the conclusion, in view of the nature, novelty and result of the case, the amount, though regrettably large, is reasonable and should be approved.

It should be noted that the function of the court in respect to the approval of these expenditures is not that of an original determination by the court as to what allowances should be made in a corporate reorganization under section 77B (now Chap. 10, 11 U.S.C.A. § 501 et seq.) of the Bankruptcy Act, 11 U.S.C.A. § 207 or in an equity case in which the court has jurisdiction of a fund and the duty to equitably distribute it. The very nature of this plan required the B and O to formulate it and obtain a large majority of assents thereto *before* it was presented to the court. The evidence satisfactorily shows that the expenditures so incurred were the result of careful business bargaining by experienced executives of the Railroad. The question, therefore, for us is not whether the particular considerations agreed to be paid for various necessary services are what the court on its own estimation of values would originally have determined to be adequate compensation, but only whether, in view of the circumstances, what the Railroad has agreed to pay, is reasonable. The evident purpose of the requirement of section 1225(6) of Chap. 15 is, in the interest of the security holders of the corporation, that funds which might otherwise be applicable to payment on their securities, shall not be wasted or lavishly disbursed for purposes or in amounts other than are reasonably and properly necessary for successful prosecution of the Plan. After careful scrutiny of the several classes of expenditures as itemized in this case, we find that the testimony sufficiently supports their necessity and reasonableness.

In considering the subject matter it is necessary to visualize the scope and magnitude of the problem confronting the Railroad. This is reviewed at some length in our prior opinion. The Plan was devised in 1938 to meet an acute financial emergency. The total capitalization of the Baltimore and Ohio Railroad Company and its subsidiaries was, in round figures, $1,000,000,000. Its total bond or note obligations was $638,353,928. Of this amount securities of the par value of $542,810,628 were affected by the Plan. The latter amount was held by individuals and corporations to the number of 76,128, widely scattered in residence throughout the United States, and a considerable number in Europe. Of this number more than 72% were reached in person or by mail or telephone, and assented to the Plan as of September 15, 1939. The assents had to be obtained in writing and whenever possible the securities themselves had to be deposited with banks or trust companies in such manner that negotiable receipts could be issued therefor and interest collected and paid through the depositories to the holders pending the consummation of the Plan. After the Plan was confirmed it was necessary to have the securities, whether theretofore deposited or not, stamped or endorsed and in most cases new coupon sheets attached, all in such form as would comply with the rules of the New York Stock Exchange so that the modified securities could themselves thereafter be dealt with by sale or pledge in proper negotiable and deliverable form. To accomplish this it was necessary for the convenience of the security holders to designate more than sixty banks or trust companies as depositories in numerous states and some in Europe, to receive, receipt for, hold, manage, collect and disburse interest thereon, and subsequently to deliver the securities in modified form in exchange for the issued negotiable receipts. It is obvious enough that to consummate the Plan large expenditures were necessary in the solicitation of the thousands of security holders; for compensation of the numerous depositories for handling the securities; for printing and postage expenses of hundreds of thousands of forms and other legal papers; and in the very large and unavoidable expense of lithographing or engraving modifications of the securities to comply with the Exchange rules. There were also necessarily extensive legal expenses for the preparation of the Plan, presentation of the case to the court, and the preparation of the supplemental indentures and modifying agreements.

It should also be borne in mind that a very large part of the total expenses was incurred for the convenience of the security holders, in preserving their opportunity to deal with their securities by

sale or pledge during the considerable interval of time necessarily elapsing between the deposit of the original securities and the re-delivery thereof in modified form. To comply with this important feature of the Plan fees and expenses of the numerous depositories were necessarily incurred in the amount of about $500,000; and the expenses of lithographing or engraving the modified securities aggregated $221,696.99. These two items alone, incurred for this particular service, represent more than one-half of the total expenditures. While these two amounts are separately very large, the testimony amply demonstrates the necessity therefor, and under the circumstances stated the reasonableness thereof. The very great majority of all the deposited securities were handled by six agents and depositories whose charge was at the rate of less than 80¢ per $1,000 bond. The charge made by a much larger number of depositories for a much smaller amount of securities was at the rate of $1.00 per bond. In the light of the testimony we regard these charges as reasonable. Two custodian depositories handling a substantial amount of bonds have requested compensation at the rate of about $3.00 per bond. This amount is regarded as unreasonable by the B and O and is not approved by us. The reasonab' amount, we think, in the two cases is $1.00 per unit handled. We are satisfied also that the cost of lithographing or engraving the modifications of the securities under the circumstances was unavoidable. The volume of work was unprecedently large and diverse, by reason of the numerous different issues of securities. We are satisfied that the officers of the B and O, experienced business men of large affairs, made the best bargain they could for this work, which had to be done for the convenience of the security holders, and in accordance with the decree of the court, within a limited time.

We have given special consideration to the amount of the legal expenses. The total is $235,000, of which the B and O has agreed to pay $200,000, to its counsel for all services in relation to the whole Plan, and about $25,000 to counsel for six different trustees, unless disapproved by the court. This amount again in the aggregate is large but, after careful reflection, we are unable to say that it is an unreasonable compensation for the nature, extent and result of the professional services rendered. From the conception of the Plan the B and O engaged exceptionally experienced counsel in both New York and Richmond who have long and continuously rendered legal services throughout the whole proceeding, including the formulation of the Plan, conferences with the parties in interest, professional services in securing the special Act of Congress, preparation for and advocacy of the case in court, which included the preparation and filing of more than 400 exhibits, the drafting of numerous supplemental indentures and modifying agreements, and attention to all the major legal details of an unprecedented case. Counsel maintain, without contradiction, and with apparent justification, that no comparable railroad reorganization case has ever been conducted and completed with so much expedition and with so little aggregate expense as in the present instance. The amount of the fee to be paid to petitioner's counsel is considered reasonable by the executives of the B and O and is not objected to by any party in interest in the case. The court is not here called upon in the first instance to fix the compensation of counsel appointed by it in connection with the administration of a fund in court; but only in this instance to determine whether, under all the circumstances, the amount of this fee as agreed upon by the B and O with counsel is unreasonably large. We are unable to conclude that it is.

The aggregate of the fees charged by counsel for the respective trustees is also considered reasonable by the officers of the B and O. Professional services to the several trustees of the modified issues were undoubtedly necessary in relation to the Plan as a whole, and, while as an original matter, we would have been disposed to think that in some instances a somewhat smaller amount would have been compensatory, the difference is so comparatively small that we have decided to approve them also.

There has been no objection from any party in interest to the whole or any item of the expenditures, but the court has on its own initiative carefully scrutinized them and endeavored by questioning from the Bench to develop all aspects of the matter.

The aggregate of all the expenditures while large in itself must fairly be considered in proportion to the case as a whole and in relation to the magnitude of the financial interests involved. The ag-

**160**

gregate expense is only about one-quarter of one per cent. of the par value of the securities affected by the Plan. One feature alone of the Plan was the extension of maturities of securities of the par value of $185,000,000. Ordinary financial and banking experience is that the very usual cost of such a financial operation is from 1½% to 2½% of the principal involved. 29 F.Supp. 629. The aggregate cost here of the whole Plan is much less than this. As heretofore indicated, the intent of the Act in subjecting the expenditures to the approval of the court is to avoid lavish expenditures to the prejudice of the security holders. We think it undeniable that the benefits obtained by the security holders under this Plan have been very great. Even in the present generally depressed securities market, the aggregate market value of the Railroad's securities affected by the Plan is about $60,000,000 more than the market value in 1938 before the promulgation of the Plan, and the present market price for all the Railroad's securities is about $86,000,000 more than the pre-plan market price. And the recent testimony as to the reasonable expectations of the result of operations of the Railroad for the current year tends to confirm the original determination that the Plan was fair, equitable and feasible and in the interest of both the security holders and the public.

Counsel for certain security holders allowed to intervene in this case, who personally participated in the hearings, have asked the court for allowances for fees for their services, to be paid by the B and O. These counsel represented the holders of securities of several issues in the amount of about $50,000. The general position of some of them was not nominally opposed to the Plan as a whole, but to obtain modifications of the Plan in certain respects for the benefit and advantage of their respective clients. Nevertheless the general effect of the success of the opposition by all of them would practically have been to defeat the Plan. The court was very glad to have these counsel participate in the case and to hear and consider their arguments. They were helpful in an understanding of the issues involved and clarifying the questions debated, and to some extent in criticizing and suggesting changes in the supplemental indenture and modifying agreements. We are, however, of the opinion that we have no authority under the Act to make the allowances. The nature of the case is not one where a court of equity has general jurisdiction over a fund in court, with incidental power to make allowances out of the fund to counsel or parties who have performed services to bring the fund into court or to preserve it. The provision of the Act in section 1225(6) with regard to approval of expenditures of the petitioners including legal expenses is the only reference to the subject in the whole Act. The legislative history of the passage of the Act referred to by counsel affords no indication that it was the intention of Congress to authorize the court exercising the special jurisdiction in this case to make such allowances to counsel for security holders appearing in opposition to the Plan, or seeking modifications of it. In this respect the Act is quite different from former section 77B and the present Chapter 10 of the Bankruptcy Act. We are unable, therefore, to make the allowances requested.

*The petition of the Manhattan Company, Trustee,* for the B and O $50,000,000 note issue asks instruction by the court as to what disposition the Trustee should now make of the accumulated dividends on the Reading Company stock which it now holds in the amount of $1,694,000, and which it has received as Trustee from time to time on and after August 1, 1939 during the pendency of this case. The question the Trustee presents arises in this way. By the terms of the decree of November 8, 1939, the Trustee, which had previously voluntarily intervened in this case, was directed to pay over to the B and O all dividends it had received from August 1, 1939 on these securities "which would have been payable to the B and O under the provisions of the said Indenture had there been no default by the B and O under said Indenture when said dividends or interest were so received, for application by the B and O to the next security interest payable on the secured notes, * * *." Of course the failure of the B and O to pay the principal of the notes which matured on August 1, 1939, was a default under the Indenture, but that default was cured by the confirmation of the Plan. There was, however, another contingency provided for in the deed of trust which gives rise to the present question. The deed provided that dividends on the Reading Co. stocks held by the trustee and registered in its name (comprising 232,000 shares

first preferred stock, 332,000 shares second preferred stock and 566,000 shares common stock) should be received by the Trustee but paid over to the B and O until there was a default, except that—

" * * * The Trustee shall be entitled to receive and shall hold as additional security hereunder any (1) dividends payable in stock or (2) dividends representing a distribution of capital or (3) dividends paid out of surplus or earnings of Reading Company when the amount of the combined capital and surplus of Reading Company *as shown by its books is,* or by reason of such payment would become, less than $225,000,000." (Italics supplied)

It further appears that at all times since August 1, 1934 (when the deed of trust was executed) the combined capital and surplus of the Reading Co. (as shown by its books) has been in excess of the decisive amount of $225,000,000, having varied between $233,000,000 and $236,-000,000. But one of the items of assets of the Reading, carried on its books at a valuation of $24,119,873.00, consists of 154,940 shares of common stock of the Central Railroad of New Jersey (sometimes called the Jersey Central) constituting a majority of the total outstanding common shares of 274,368. The value of this Jersey Central stock owned by the Reading Co., has been throughout the period carried at its approximate cost to the Reading Co., of about $160 per share. The Jersey Central has for some time past been in financial difficulties owing to economic conditions and particularly to a large tax controversy with the State of New Jersey. This matter was briefly referred to in our former opinion. 29 F. Supp. 625. Since then the Jersey Central has been placed in railroad reorganization under section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205. It has been unable recently to pay the accruing interest on its bonded indebtedness of $48,731,000. The market price of its common stock is now only $5.00 per share. Its financial future is dependent upon further developments. In these circumstances the Manhattan Co., as Trustee, is uncertain whether it should insist on holding the accumulated dividends and any future dividends on Reading stock as additional security for the payment of the principal and interest of the $50,-000,000 B and O bonds, or whether it should continue to pay over these dividends to the B and O in accordance with the express wording of the indenture, as it still appears from the Reading's books that its capital and surplus exceeds the decisive amount of $225,000,000.

Upon first consideration of the question so presented, the court *sua sponte* raised the question as to whether the point presented was properly within the jurisdiction of the statutory court under the Special Act. It first occurred to us that possibly the subject matter was so far collateral to the special authority conferred upon the court that the question raised by the Trustee should be litigated in a separate and independent proceeding. It may be suggested that the particular purpose of the Special Act was only to submit to the statutory court the fundamental question as to whether the Plan should be confirmed with the effect of binding a dissenting minority of security holders. However, subsequent consideration of the matter leads us to conclude that the question presented is sufficiently incidentally related to and involved in the disposition of the whole case to justify our instructing the Trustee as to its proper duty with respect to the disposition of these dividends, the annual amount of which in recent years has approximated $1,700,000. While this amount is not of itself sufficiently large, in view of the whole financial condition and prospects of the B and O, to be vital as to the feasibility of the Plan, it is apparent that the amount (nearly 10% of the total fixed interest of the B and O under the Plan) may be important in the successful operation of the Plan, and constitutes a question of substantial interest between the holders of the secured notes and other issues of securities.

Section 1215 of the Act provides that the special court during the pendency of the proceedings "shall have exclusive jurisdiction of the petitioner *and of its property* wherever located to the extent which may be necessary to protect the same against any action which might be inconsistent with said plan of adjustment *or might interfere with the effective execution of said plan if approved by the court,* or otherwise inconsistent with or contrary to the purposes and provisions of this chapter." (Italics supplied) We think it may fairly be said that the failure of the Trustee to pay over the dividends to the B and O, if it is the duty of the Trustee to do so, may interfere with the effective execution of the Plan. The proviso in the section to the effect that the court

shall not be authorized to appoint a trustee or receiver or otherwise take possession of the property of the B and O or control its operation or administration was evidently intended to preclude an extent of jurisdiction which would amount to the ordinary general railroad receivership or reorganization. The limited nature of the proviso would seem, however, rather to emphasize the affirmative grant of jurisdiction to the extent necessary to secure the effective execution of the Plan if approved.

Despite the adequate notice by mail to all parties to the case (including some holders of the secured notes who have intervened in the case) and to all other noteholders whose addresses are known to the B and O, and in addition general notice by publication, no holder of any of the secured notes has made any objection to action by the court on the Trustee's petition. Counsel for the Trustee, which has voluntarily sought the aid of the court, confidently maintains that we have and should exercise the jurisdiction, and the B and O has acquiesced in that position. The only opposition from any source comes from the holders of a very small amount of B and O bonds of a different issue who, in the alternative, advance the contention that if the court assumes jurisdiction to instruct the Trustee, the latter should be required to pay over the dividends to the B and O.

On the merits of the question submitted we have no difficulty in reaching the conclusion that the Trustee should, under existing circumstances, continue to pay over these Reading Co., dividends to the B and O. The relevant facts have been fully developed and presented in court. While the B and O owns about 48% of the voting stock of the Reading Co., it has not undertaken to control its management, having nominated only one of its eight directors; and the testimony shows that the B and O has not interfered with the independent bookkeeping of the Reading Company's books, which also must be kept in accordance with the rules and regulations of the Interstate Commerce Commission. Until January 1, 1940, the rules of the Commission provided with respect to "book value of securities owned" that they might be carried by the railroad either at cost or at a reasonable valuation other than cost; that is, at "ledger value". As of January 1, 1940 the regulation was amended to permit the railroad to "write down" book cost of securities in recognition of decline in value and this "write down" should be made "if there was no reasonable prospect of realizing any value therefrom but fluctuations in market value should not be regarded although a permanent impairment in value should be recognized in the accounts." As we have said, whether the value of the Jersey Central stock has been permanently impaired depends upon future developments. But even if realistic considerations should be regarded as leading to the view that there has been a permanent impairment, that is not the conclusive consideration for the solution of the problem presented. The question here is whether the capital and surplus fund of the Reading as a whole is still more than the decisive amount of $225,000,000. The general balance sheet of the Reading as of May 31, 1940 shows that its total assets are valued at $456,329,456.21. These consist of its railroad equipment, investment in affiliated companies, current assets, deferred assets, and numerous other items of property. If the note holders are entitled to have a present re-writing of the Reading Company's books with respect to the proper valuation of the particular item of the Jersey Central stock, the B and O would likewise be entitled to a revision of other items also. In other words, there would seemingly have to be a re-valuation of the total assets of the Reading Co. Furthermore it is pointed out that by reason of the operating relations between the Reading Co., and the Jersey Central, the real value of the majority voting control of the stock of the Jersey Central to the Reading is not measured only by market price of the stock. So long as the Reading continues to own the controlling stock interest in the Jersey Central it may be of much greater practical value to the Reading than its mere market quotation under depressed circumstances. It is also relevant to note that the book value of the Jersey Central stock is $341.28 per share; and that the gross railway operating revenues of the Jersey Central were greater in 1939 than in 1934, when the notes were issued, although the net deficit was also somewhat larger.

■ But the controlling consideration in our view is that the very definite provision in the deed of trust affecting this matter requires the Trustee to base its action with respect to the disposition of the Reading Company dividends on the amount of the capital and surplus of the Reading Company *as shown by its books*.

We think it could never have been contemplated by the parties to this instrument that the Trustee would be expected to question and independently analyze the bookkeeping of the Reading Company from time to time as these dividends were paid over to it at monthly intervals. Such an understanding would have made the trust unduly burdensome, hazardous and impracticable of operation from the standpoint of the Trustee.

██ As the deed of trust securing the note issue was executed and delivered in New York and the notes secured thereby are payable in New York, it is to be interpreted and applied in accordance with the judicial decisions of that State. These legal financial instruments are particularly well known in New York and have been frequently considered and discussed in the decisions of the New York Courts. The holders of the securities issued thereunder are legally bound by the terms of the indenture unless contrary to public policy. If they are clear and unambiguous, as in this case, no rights or obligations in conflict therewith should properly be implied. Benton v. Safe Deposit Bank, 255 N.Y. 260, 174 N.E. 648; Doyle v. Chatham & Phenix Nat. Bank, 253 N.Y. 369, 376, 171 N.E. 574, 71 A.L.R. 1405; Hazzard v. Chase Nat. Bank, 159 Misc. 57, 287 N.Y.S. 541, affirmed without opinion 257 App.Div. 950, 14 N.Y.S.2d 147; and Id., 1940, 282 N.Y. 652, 26 N.E. 2d 801. The case last cited contains a very full discussion of previous relevant decisions of New York courts. It dealt with the measure of duty to a trustee under such an instrument in accepting substituted collateral under a provision authorizing such acceptance where a certificate showed a required amount of earnings. It was also provided that in ascertaining earnings, allowance should be made for depreciation *as shown by the books* of the respective companies. 159 Misc. at page 72, 287 N.Y.S. 541. Opposing experts differed as to the amounts properly allowable for depreciation; but the court held that the trustee was entitled to rely on the language in the trust indenture "which provided that the amounts carried on the books of the respective companies should be the test for the amount of depreciation, as well as the method of depreciation." [159 Misc. 57, 287 N. Y.S. 558.]

██ Under the special provisions of such conventional deeds of trust the duties of the so-called trustee are far less than those of a common law trustee in most respects, but nevertheless it owes the exercise of good faith to the security holders, and must exercise due care in compliance with the particular provisions of the instrument, especially in dealing with the collateral deposited with it. Rhinelander v. Farmers' Loan & Trust Co., 172 N.Y. 519, 65 N.E. 499; Frishmuth v. Farmers' Loan & Trust Co., C.C., 95 F. 5, affirmed, 2 Cir., 107 F. 169; Prudence Co. v. Central Hanover Bank & Trust Co., 237 App. Div. 595, 262 N.Y.S. 311, affirmed 261 N.Y. 420, 185 N.E. 687. While the trustee in this case was doubtless justified in taking note of the pending recent proceedings for the financial reorganization of the Jersey Central and in submitting the question to the court as to its duty in that respect, we do not think the facts so far developed require the trustee to personally withhold the accumulated dividends as further security for the principal and interest of the notes. There is nothing in the case to show that the books of the Reading Company have not been fairly, honestly and independently kept in ordinary course of business. If there were evidence to the contrary we would have a different situation to deal with. And what we have now said upon this subject is without prejudice to the re-opening of the question either by the Trustee or the note holders in a proper proceeding hereafter if and when the factual situation becomes different.

It is also very significant that no holder of any of the secured notes has appeared in this proceeding to contest the propriety of the continued payment of the dividends by the Trustee to the B and O. The Reconstruction Finance Corporation, as the holder of about $13,500,000 of the notes, was represented at the hearing by its counsel who did not submit any opposition to the payment of the dividends to the B and O. It is reasonable to infer from this non-action of the note holders that they do not regard it important, and perhaps not even desirable, that the dividends should be withheld. The position of these note holders in the present capitalization of the B and O, and especially under the Plan, is a very favorable one. They hold a short term obligation maturing now in four years, which it seems probable will be paid or satisfactorily refunded if the present prospects of the B and O are realized; and in the meantime their right

to receive their interest is not only secured to the extent of the income from the collateral but is made a fixed interest charge as a part of the total amount of fixed interest of (now) about $19,000,000. The successful continuance of operation of the Plan is therefore of considerable importance to these note holders as well as to holders of the other affected securities of the B and O. It seems quite probable that under present conditions it is desirable in the interests of these note holders themselves that the Reading dividends should be paid over to the B and O; and it is not unlikely that the withholding of them would adversely affect the present market value of their notes. We conclude, therefore, that the Trustee should be and it is hereby instructed to pay over to the B and O all dividends on the Reading Company stock heretofore received by it; but without prejudice to further consideration of the subject matter in the future in the light of then existing conditions.

We will sign orders in accordance with this opinion.